**UNITED SERVICES AUTOMOBILE ASSOCIATION, Plaintiff,**

v.

**William J. PERRY, Secretary of United States Department of Defense and the United States of America, Defendants.**

**Civ. A. No. SA–94–CA–365.**

United States District Court,
W.D. Texas,
San Antonio Division.

May 17, 1995.

## ORDER

BIERY, District Judge.

This is a case of first impression in which the Court is requested to interpret the meaning and intent of Congress' 1990 amendment of 10 U.S.C. § 1095 as it applies to a first-party automobile insurer's obligation to reimburse the United States for medical care the government renders military-related insureds injured in automobile accidents. An historical and well-reasoned overview of pre–1990 10 U.S.C. § 1095 may be found in *United States v. United Servs. Auto. Ass'n,* 5 F.3d 204 (7th Cir.1993). For the reasons stated below, the Court grants the summary judgment motion of the United Services Automobile Association ("USAA").

### *BACKGROUND*

The undisputed facts establish that twelve people who are either active and retired military service personnel or military dependents were injured in separate, unrelated automobile accidents. All twelve were covered by automobile insurance policies issued by USAA. As part of the coverage under its "Easy Reading Auto Policy," USAA was obligated to cover its insureds for medical expenses incurred in automobile accidents. All twelve of the insureds were injured in auto accidents and treated after November 1990. In addition to their automobile insurance coverage with USAA, the twelve insureds were also entitled to medical care in a military hospital by virtue of their military status. Each individual, therefore, could choose to seek treatment for injuries in a non-military facility for which USAA would cover the costs, or each could choose treatment in a government medical facility. As a result of their injuries, each of the twelve insureds sought treatment at Army medical facilities in Georgia, Missouri, California and Alabama and Air Force facilities in Arkansas, Illinois and Ohio.

Because the insureds received free medical care at the military medical centers, USAA incurred no obligation to reimburse the insureds for their costs. The United States, however, brought claims against USAA for reimbursement of the costs of the medical

Barry A. Chasnoff, Stephan Bruce Rogers, Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, TX, for plaintiff United Services Auto. Ass'n.

Colette J. Winston, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendant William J. Perry, Secretary of U.S. Dept. of Defense.

John F. Paniszczyn, U.S. Attys. Office, San Antonio, TX, Colette J. Winston, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendant U.S.

care the federal government had rendered to the insureds pursuant to 10 U.S.C. § 1095. USAA filed suit and moved for summary judgment contending it is not a "third-party payer" as defined by the statute and is, therefore, not statutorily liable to the United States. USAA additionally argues the statute does not allow Department of Defense ("DOD") definitions of "no-fault insurance" and "insurance, medical service, or health plan" because they are contrary to § 1095. The United States also moved for summary judgment, arguing that USAA is a "third-party payer" under section 1095 and thus statutorily liable for the costs of the medical care. Moreover, the United States contends the DOD definitions are allowed under the statute.

### 10 U.S.C. § 1095

■ Section 1095 states in pertinent part:

In the case of a person who is a covered beneficiary, the United States shall have the right to collect from a third-party payer the reasonable cost of health care services incurred by the United States on behalf of such person through a facility of the uniformed services to the extent that the person would be eligible to receive reimbursement or indemnification from the third-party payer if the person were to incur such costs on the person's own behalf.

10 U.S.C. § 1095(a)(1). Prior to the 1990 amendment, "third-party payer" was defined as "an entity that provides an insurance, medical service, or health plan by contract or agreement." Automobile insurers were not third-party payers as defined in the original § 1095. *United States v. United Servs. Auto. Ass'n*, 5 F.3d 204, 209 (7th Cir.1993). Effective November 5, 1990, however, § 1095 was amended to define third-party payer as "an entity that provides an insurance, medical service, or health plan by contract or agreement, *including an automobile liability insurance or no fault insurance carrier.*" 10 U.S.C. § 1095(h)(1) (1995) (emphasis added). The issue before the Court is whether the amended definition of third-party payer includes an automobile insurer who has provided voluntary first-party coverage for a military-related insured's medical expenses

for injuries sustained in an auto accident which is neither mandated by state law nor designed to replace tort liability (this insurance is sometimes referred to as "Medpay coverage"). The United States argues USAA is a third-party payer as defined in § 1095 because it is an "automobile liability insurance or no fault insurance carrier." USAA contends its coverage cannot be considered "automobile liability insurance" or "no fault insurance" coverage. Under USAA's interpretation of the amended statute, "three key characteristics" distinguish its insurance from automobile liability insurance and no fault insurance:

1. USAA's coverage is "first-party" insurance, meaning that the insured obtains benefits directly from USAA. Automobile liability insurance is "third-party" coverage obligating the insurance company to pay for damages incurred by a person injured by the insured;

2. USAA's coverage is not no fault insurance because it is not designed to replace tort liability; and

3. USAA's coverage is voluntary add-on insurance, meaning that USAA is not mandated by statute to provide the insurance. No fault insurance is, by definition, mandated by statute.

### STANDARD OF REVIEW

This case is presented to the Court on cross-motions for summary judgment on stipulated facts. As such, it is a proper case for the exercise of summary judgment under Rule 56 of the Federal Rules of Civil Procedure. FED.R.CIV.P. 56(a), (b); *Schlytter v. Baker*, 580 F.2d 848, 849 (5th Cir.1978); *United States v. 1957 Oldsmobile 4–Door Sedan*, 173 F.Supp. 956, 957 (S.D.Tex.1959). When the parties proceed on the same material facts, a court will grant summary judgment only when the moving party is entitled to judgment as a matter of law. FED. R.CIV.P. 56(c); *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir.1975); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). When faced with cross-motions, the Court must consider each party's motion sep-

arately, and each movant has the burden of presenting evidence to support its motion. *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988).

Turning to relevant substantive law, this Court must follow principles of statutory construction to determine the proper meaning of § 1095. The overriding goal of these principles is to identify and effectuate the intent of Congress. If the statutory language is clear as to its intended meaning, the Court's inquiry generally is at an end. If, however, the language is sufficiently vague to preclude definitive adjudication on this basis, the Court must use "traditional tools of statutory construction," including examination of the statute's history and purpose, and application of established rules of construction. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446–47, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *see also NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987). If an ambiguity remains despite the application of these tools, the courts normally defer to an "expert administrator's statutory exposition" of the statute which is reasonable and otherwise permissible "in light of the legislature's revealed design." *NationsBank v. Variable Annuity Life Ins. Co.,* — U.S. —, — — —, 115 S.Ct. 810, 813–14, 130 L.Ed.2d 740 (1995) (quoting in part *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). The Court will evaluate the parties' competing interpretations of the amended § 1095 under these principles.

*United States v. United Servs. Auto. Ass'n,* 5 F.3d 204 (7th Cir.1993), involving identical parties and the interpretation of the pre–1990 statute, is instructive. The government filed a complaint against USAA seeking reimbursement for medical care the United States rendered three military retirees or dependents after each was injured in an automobile accident. *Id.* at 205. The district court found USAA was a "third-party payer" pursuant to the pre–1990 version of 10 U.S.C. § 1095. Specifically, the district court determined, based on the clear language of the statute, USAA was an "an entity the provides an insurance, medical service or health plan by contract or agreement." *Id.* at 206. The Seventh Circuit Court of Appeals disagreed:

> [I]t is uncertain whether an automobile insurance policy provision, which covers medical costs resulting from automobile accidents, is "an insurance, medical service, or health plan" under § 1095. Such a provision could be characterized as "medical service" or "health plan" because the policy does cover medical expenses under certain circumstances. However, Congress' use of the term "insurance" as an adjective rather than a noun, and the use of the terms "medical" and "health" in juxtaposition with "plan" could also indicate that the statute was intended to reach issuers of health care insurance.

*Id.* at 206–07. The Court, after reviewing the plain language of the statute, the legislative history of both the original and amended versions, and DOD regulations for interpretive guidance, found the statute was only intended to reach issuers of health care insurance. *United Servs. Auto. Ass'n,* 5 F.3d at 207. The Court concluded, at least up until 1990, Congress was primarily concerned with authorizing reimbursement from health insurers of second career military personnel. *Id.* at 208.

### ANALYSIS

In interpreting the post–1990 version of § 1095, "we begin, of course, with the words of the statute," *Phillips v. Marine Concrete Structures, Inc.,* 895 F.2d 1033, 1035 (5th Cir.1990). As noted above, § 1095 applies solely to a "third-party payer." 10 U.S.C. § 1095(a) (1995). Congress now defines a third-party payer as "an entity that provides an insurance, medical service, or health plan by contract or agreement, including an automobile liability insurance or no fault insurance carrier." *Id.* at (h)(1).

In its motion for summary judgment, the United States first contends the very last word in the amendment, "carrier," makes the statute applicable solely to the insurer, and not the insurance. This Court, however, must give full effect to all the words used by Congress. *Donnely v. Mavar Shrimp & Oyster Co.,* 190 F.2d 409, 411 (5th Cir.1951).

Each word must be given significance and every part of the statute must be construed in connection with the whole, so as to make all parts harmonize. *Washington Market Co. v. Hoffman,* 101 U.S. 112, 115–16, 25 L.Ed. 782 (1879). Though the bare language of the amendment alters the definition of "entity" to include specifically "automobile liability insurance or no fault insurance carriers," the word "insurance" remains a part of § 1095. Whether the first-party Medpay coverage insurance is encompassed by § 1095, therefore, remains in issue.

■ The United States next contends the word "insurance" makes the statute applicable to all automobile insurance plans, including the first-party Medpay coverage. Congress, however, specifically defined the types of plans, contracts and agreements that create a third-party payer. The amendment names two specific types of insurance: automobile liability insurance and no fault insurance. The United States' interpretation extending the scope of the statute to the universe of all automobile insurance plans would require this Court impermissibly to render significant portions of the statute meaningless. *See United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). Because Congress wrote the amendment to apply to specific categories of plans, contracts, and agreements, including two types of automobile insurance, it can be inferred that Congress did not intend to include other genres of insurance. *See Quarles v. St. Clair,* 711 F.2d 691, 699 n. 22 (5th Cir.1983) (when Congress says "one thing" it "does not mean something else") (quoting *Duke v. University of Texas,* 663 F.2d 522, 526 (5th Cir.1981)); *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993); *Truman v. United States,* 26 F.3d 592, 597 (5th Cir.1994). This is especially true when the amendment is considered in light of 10 U.S.C. 1095(h)(2), which states "[t]he term 'insurance, medical service, or health plan' includes a preferred provider organization and an insurance plan described as Medicare supplemental insurance." Thus,

the post–1990 amendment statute is limited to the following: automobile liability insurance, no fault insurance, preferred provider plans, and Medicare supplemental insurance. 10 U.S.C. § 1095(h)(1), (2). Because Congress "knows how to" legislate broadly "when it wants to," that Congress failed to do so here argues forcefully that such action was not its intention. *Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 106, 108 S.Ct. 404, 410, 98 L.Ed.2d 415 (1987); *Warner v. Crum & Forster Comm. Ins. Co.,* 839 F.Supp. 436, 439 (N.D.Tex.1993).

The United States next contends the use of the word "including" to attach the 1990 amendment to the original language indicates Congress was merely giving examples of types of insurance covered by the statute. While "include" may mean "for example," it may also mean "and" or "in addition to" or even "means." *See* BLACK'S LAW DICTIONARY *Include* (6th ed. 1990) (word "include" means "and"); *see also Helvering v. Morgan's Inc.,* 293 U.S. 121, 125, 55 S.Ct. 60, 61, 79 L.Ed. 232 (1934) ("includes" is synonymous with "means"); *Adams v. Dole,* 927 F.2d 771, 777 (4th Cir.), *cert. denied,* 502 U.S. 837, 112 S.Ct. 122, 116 L.Ed.2d 90 (1991) ("including" may be defined as "in addition to"). What the word means in a particular case depends on the context, legislative history, and rules of construction. *Helvering,* 293 U.S. at 126–30, 55 S.Ct. at 61–64; *Morris Friedman & Co. v. United States,* 69 Cust.Ct. 184, 351 F.Supp. 611, 613 (1972). One rule of construction is that "courts must reject interpretations which lead to unreasonable results in favor of those which produce reasonable results." *Birdwell v. Skeen,* 983 F.2d 1332, 1337 (5th Cir.1993). Looking at the language of the amendment in this context, this Court cannot conclude it is reasonable to believe Congress would have stated its intent to embrace all types of automobile insurance plans by restricting the statute to third-party automobile liability and no fault insurance. Had it desired, Congress could have easily included all first-party coverage in the amendment.

Based on the foregoing, this Court concludes the language of § 1095 will not support the United States' argument the post–

1990 statute applies to all forms of automobile insurance plans. Nevertheless, and in light of the United States' argument that the word "including" could be characterized as meaning "for example," it is appropriate to consult legislative history for confirmation of this Court's understanding of Congress' intent. *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 147 n. 3 (5th Cir.1983); *see also Steve Jackson Games, Inc. v. United States Secret Serv.*, 36 F.3d 457, 461 (5th Cir.1994).

In 1986, Congress sought to make "major reductions in the staggering budget deficits [then] facing the United States" by passing the Comprehensive Omnibus Budget Reconciliation Act of 1986, 99th Cong., 2d Sess., 100 Stat. 82 ("Public Law 99–272"); S.Rep. No. 146, 99th Cong., 2d Sess. (1985), *reprinted in* 1986 U.S.C.C.A.N. 42, 43. The Act created 10 U.S.C. § 1095. Public Law 99–272, § 2001, 100 Stat. 100. The stated purpose of the statute was to "provide authority for the Secretary of Defense to bill private insurers for the reasonable cost of medical and dental care provided in military medical facilities to nonactive-duty beneficiaries … who are also covered by health insurance plans." H.Rep. No. 300, 99th Cong. (1985), *reprinted in* 1986 U.S.C.C.A.N. 756, 763.

It appears § 1095 was enacted in response to calls for Congress to shift public health care costs to private health insurance companies. In a 1984 report, the Congressional Budget Office ("CBO") recommended that Congress give the Department of Defense statutory authority to recover the costs of military health care from health insurers of military insureds. *See* CBO, Options for Change in Military Medical Care (March 1984), at 21–24. Early in 1985, the Government Accounting Office ("GAO") issued a similar report recommending that Congress shift the public costs of veterans' health care to private health insurers. GAO, Legislation to Authorize VA Recoveries from Private Health Insurance Would Result in Substantial Savings (HRD–85–24 Feb. 26, 1985).

There is no indication in either the CBO or GAO reports that consideration was given to the impact the proposed legislation would have on non-health insurance providers, such as automobile insurers. *See United Servs. Auto. Ass'n*, 5 F.3d at 208 (legislative history of § 1095 "carefully states the statute's effect on health insurers, [but] nowhere does the legislative history make any reference to auto insurers."). In fact, the language and legislative history of § 1095 leave no doubt the original language was intended to refer only to health insurance plans. *Id.* (discussing Congressional concern with authorizing reimbursement from health insurers of second career military personnel). Thus, for § 1095 to apply to the Medpay coverage, it must do so by virtue of the language added to the statute in 1990. The Court now turns to the issue of whether first party automobile insurance coverage, not mandated by statute or designed to replace tort liability, is "automobile liability insurance" or "no fault automobile insurance."

## WHETHER MEDPAY COVERAGE IS AUTOMOBILE LIABILITY INSURANCE

As discussed above, § 1095 was amended in 1990 to expand its definition of "third-party payer" to include "automobile liability insurance or no fault insurance carriers." 10 U.S.C. § 1095(a)(2), (h)(1). The United States contends the Medpay coverage can be considered "automobile liability insurance" as referred to in the 1990 amendment. Liability insurance, however, has traditionally been defined as third-party coverage that indemnifies the insured from liability to others. Black's Law Dictionary *Insurance* (liability insurance) 805 (6th ed. 1990) (distinguishing liability policies from indemnity policies). The Medpay coverage is first-party insurance that reimburses the insured for medical expenses resulting from an automobile accident. Moreover, even the Secretary of Defense has determined that "automobile liability insurance" is coverage against "legal liability." 32 C.F.R. § 220.12(a)(1), (2). Because Medpay coverage does not require evidence of a tortious act, circumstances of liability are not implicated. Of course, the Seventh Circuit has previously concluded that Medpay coverage is not covered by the statute because it is not health insurance. *United*

*States v. United Servs. Auto. Ass'n,* 5 F.3d 204, 207 (7th Cir.1993)

## WHETHER MEDPAY COVERAGE IS "NO FAULT INSURANCE"

For § 1095 purposes, the United States construes the phrase "no fault insurance" to encompass any type of automobile insurance that pays first-party benefits without regard to the fault of the insured. USAA contends "no fault insurance" is a term of art that refers to first-party medical benefits coverage that is mandated by statute as a replacement for fault-based tort recovery.

■ It is not disputed treatise-writers and legal scholars consider the phrase "no fault insurance" to be a term of art with a specific meaning. According to this usage, no fault insurance means first-party automobile insurance provided pursuant to state law that places limits on tort recovery. Automobile first-party insurance which is not required by statute, or does not to some extent supplant tort recovery is not "no fault insurance." *See generally* R. LONG, THE LAW OF LIABILITY INSURANCE § 27.01, at 27–3 (Matthew Bender 1994); COUCH CYCLOPEDIA OF INSURANCE LAW 2d § 45.661, at 246 (1981); I. MEHR & E. CAMMACK, PRINCIPLES OF INSURANCE 323 (7TH ED. 1980); W. ROKES, NO-FAULT INSURANCE 5 (1971). Given this construction, the Medpay coverage is not "no fault insurance."

The United States contends Congress did not use the phrase as a term of art, but instead intended to generically refer to any type of automobile insurance where there is "no" requirement of "fault." The United States asserts the phrase has been used in this sense in case law and in a 1985 study prepared by the United States Department of Transportation. U.S. DEPT. OF TRANSP., COMPENSATING AUTO ACCIDENT VICTIMS: A FOLLOW-UP REPORT ON NO-FAULT INSURANCE EXPERIENCES 15 (DOT–P–30–84–20, May 1985). In light of the wide treatment of no fault insurance as a term of art with a specific acquired meaning, these instances are instructive but not persuasive. The issue of statutory construction as it applies to the term "no fault insurance" was not before the court in the cases cited. Additionally, the Department of Transportation study recognized that according to one "school of thought" it is not proper to use the phrase "no fault insurance" generally to refer to any type of first-party coverage that provides benefits without regard to fault. The study also opines that medical payments coverage, such as the Medpay coverage involved here, is not no fault insurance even in the loose sense. *Id.* at 15, 50. This approach to construing the term "no fault insurance" is consistent with recent United States Supreme Court decisions. In *MCI Telecommunications Corp. v. AT & T,* —— U.S. ——, ——, 114 S.Ct. 2223, 2230, 129 L.Ed.2d 182 (1994), the Court held that it is not proper to give a statutory term an unorthodox meaning even if it appears in an "out-of-step" dictionary. (word "modify" connotes "moderate change," even though some define it as meaning "to change fundamentally"). Even more instructive is *Sullivan v. Stroop,* 496 U.S. 478, 483, 110 S.Ct. 2499, 2503, 110 L.Ed.2d 438 (1990), where the Court held that "where a phrase in a statute appears to have become a term of art ... any attempt to break down the term into its constituent words is not apt to illuminate its meaning." In *Sullivan,* the Court determined the phrase "child support" is a term of art with a generally-accepted meaning, and rejected an argument the term could be broadly construed to refer to any kind of "support" received from any source by a "child." *Id.* Applying these principles to this case, the Court concludes "no fault insurance" is a "settled" term of art and Congress used the term as such in § 1095. *See Director, Office of Workers' Compensation Programs v. Greenwich Collieries,* —— U.S. ——, ——, 114 S.Ct. 2251, 2257, 129 L.Ed.2d 221 (1994) (because term "burden of proof" acquired generally accepted meaning in legal community at time of enactment, Court concluded Congress intended term in this sense).

Although no legislative history of the amendment has been recorded, the history of no fault insurance and in particular Congress' past dealings with this issue, indicate that when Congress used the term "no fault insurance," it had in mind a specific and well-defined meaning. *See Herren v. United States,* 317 F.Supp. 1198, 1203 (S.D.Tex.1970)

(quoting *United States v. Fisher*, 2 Cranch (6 U.S.) 358, 386, 2 L.Ed. 304 (1805)), *aff'd per curiam*, 443 F.2d 1363 (5th Cir.1971) (when interpreting amendment, Court may consult available authorities to determine "the mischief the amendment was intended to eliminate.") No fault automobile insurance proposals were first formulated early in this century as an adaptation of the workers compensation archetype. In a no fault insurance system, tort rights are abrogated or curtailed in connection with injuries sustained in automobile accidents and are replaced with rights to insurance proceeds. In this manner, the heavy systemic costs involved in establishing fault in tort are saved and more dollars are available for the payment of benefits. *See generally* R. LONG, THE LAW OF LIABILITY INSURANCE § 27.01, at 27–3 (Matthew Bender 1994); COUCH CYCLOPEDIA OF INSURANCE LAW 2d § 45.661, at 245 (1981); W. ROKES, NO-FAULT INSURANCE 1–3 (1971).

Beginning in 1970, a number of jurisdictions responded to the burgeoning costs associated with automobile accidents by adopting no fault insurance plans and other motor vehicle insurance reform laws. However, this trend slowed after 1973. Congress, disappointed with the progress of reform, proposed federal no fault insurance legislation. Senate Bill 354, which was debated for over two years but not passed, would have required the states to mandate that insurers provide first-party automobile coverage and to place substantial limits on tort recovery. S.REP. No. 382, 93rd Cong., 1st Sess. (1974); S.B. 354, §§ 104, 105, 206 at pp. 68, 70, 104.

In proposing this legislation, Congress express particular concern some of the states had adopted reforms which did not limit tort recovery and thus would not be considered "true" no fault insurance laws. In a 1974 report, Congress wrote:

> Only 16 of the 24 States that have enacted motor vehicle insurance reform laws restrict, to at least some degree, the tort lawsuit remedy for automobile accident injuries. Since restriction of tort lawsuits is a key element in any effort to produce a low-cost, comprehensive, and fair system for compensating and restoring motor vehicle accident victims on a no-fault basis, only these 16 States can be said to have genuine no-fault laws. Some of the other 8 State laws require first-party benefits insurance coverage for motor vehicle accident victims, without regard to fault, but they do not restrict tort liability; the others do no more than obligate insurers to offer first-party benefits to their insureds to purchase or not, as they choose.

S.REP. No. 283, 94th Cong., 1st Sess., at 23–24 (emphasis added). This language illustrates Congress' understanding that limitation of tort liability is a key element of the no fault concept. This language also indicates that Congress understood the distinction between genuine no fault insurance laws, which limit tort recovery, and other laws which only require insurers to provide first-party automobile coverage without any tort limitation. Thus, this Court infers that Congress viewed limitation of tort liability as essential to true no fault insurance legislation, and used the term "no fault insurance" in § 1095 to refer to such laws.

In reviewing the legislative history of no fault insurance, it is helpful to consider the federal agenda in another area: the recovery of reimbursement for government health care costs from tortfeasors under the Federal Medical Care Recovery Act ("FMCRA"), 42 U.S.C. §§ 2651–53 (1994). The FMCRA, enacted in 1962, gives the United States an independent right to recover from tortfeasors the costs of treating injured persons in government facilities. The statute makes recovery contingent upon a showing that there is "tort liability upon some third person . . . to pay damages." 42 U.S.C. § 2651; *see also United States v. Haynes*, 445 F.2d 907, 908 (5th Cir.1971) (FMCRA not applicable unless circumstances create tort liability). In other words, when a person is injured and treated in a military medical center, the United States may seek reimbursement from anyone who is liable in tort for the injuries.

Because of the FMCRA's dependence on fault, however, the adoption of compensation schemes not based on fault caused the government to experience increasing difficulty in recovering under the FMCRA. *See Pennsylvania Nat'l Mutual Casualty Insurance Co. v. Barnett*, 445 F.2d 573, 575 (5th Cir.

1971) (FMCRA applies in tort situations and does not apply where source of claim is workers' compensation). More precisely, no fault insurance plans had the effect of hampering recovery under the FMCRA for government treatment of automobile accident victims. *See e.g., United States v. Trammel,* 899 F.2d 1483, 1484–89 (6th Cir.1990) (government's FMCRA rights effectively abrogated by Kentucky's no fault insurance statute); *United States v. Travelers Indem. Co.,* 729 F.2d 735, 737 (11th Cir.1984) (Georgia no fault statute precluded government's recovery under FMCRA); *Heusle v. National Mut. Ins. Co.,* 628 F.2d 833, 837 (3d Cir.1980) (FMCRA recovery abrogated by Pennsylvania no fault statute); *United States v. Allstate Ins. Co.,* 573 F.Supp. 142, 144–46 (W.D.Mich.1983) (Michigan no fault statute renders FMCRA inapplicable). These cases created a problem for the United States because a large percentage of FMCRA cases involved automobile accidents. *See* GAO, Military Health Care: Recovery of Medical Costs from Liable Third Parties Can Be Improved, NSIAD–90–49, at 11 (April 1990) (about 90% of all third-party recoveries arose from automobile accidents).

In 1981, Congress took the first steps to resolve the conflict between state no fault insurance laws and medical cost recovery under the FMCRA as it affected the Veterans' Administration ("VA"). Congress enacted 38 U.S.C. § 629 (now § 1729) as part of the Veterans' Health Care, Training, and Small Business Loan Act of 1981, 97th Cong., 1st Sess., § 106, 95 Stat. 1050 (1981) ("Public Law 97–72"). This statute gave the VA a right to reimbursement for medical costs from workers' compensation plans, crime victim's compensation laws, and "as the result of a motor vehicle accident covered under a State's 'no fault' provisions." H.Rep. No. 79, 97th Cong., 1st. Sess., at 1–9, *reprinted in* 1981 U.S.C.C.A.N. 1692. The legislative history of Public Law 97–72 shows Congress' concern was focused on the group of seventeen states which had "no-fault automobile insurance statutes." *Id.* at 8, 1981

U.S.C.C.A.N. 1693.[1] This further indicates that Congress, when it spoke of no fault automobile insurance, was referring only to those states with genuine no fault insurance, and excluded from this category those states which did not limit tort recovery. Thus, all indications lead to the conclusion that the 1981 Congress referred to no fault automobile insurance in the same sense it had in 1974 when it discussed the fact some states had failed to adopt genuine no fault insurance. Congress expressed no concern with non-mandatory first-party automobile insurance—a form of coverage which was, and is, available in every other state in the union. This latter category of voluntary medical payments insurance, which includes the Medpay coverage at issue, is thus twice removed from what Congress considered no fault automobile insurance.

In 1990, the same year § 1095 was amended, the GAO recommended that Congress resolve the conflict between no fault insurance recovery and recovery by the United States under the FMCRA. GAO, Military Health Care: Recovery of Medical Costs from Liable Third Parties Can Be Improved, NSIAD–90–49 (April 1990). The GAO reported that recovery by the United States was being defeated in those jurisdictions that had enacted no fault automobile insurance laws. *Id.* at 31. The GAO "recommend[ed] that the Congress enact legislation to enable recovery by the government in states with no-fault automobile insurance laws." *Id.* at 32. Thus, the GAO called upon Congress to remedy the loss of FMCRA recovery by the DOD, just as it had nine years earlier with respect to the Veterans Administration.

Congress acted on the GAO recommendation that same year when it expanded § 1095 (which had previously applied only to health insurers) to include "automobile liability insurance or no fault insurance carriers." National Defense Authorization Act for Fiscal Year 1991, § 713, 104 Stat. 1485, 1583–84 (1990); H.Cong.Rep. No. 923, 101st Cong., 2d

---

1. At the time, there were sixteen states with genuine no fault insurance laws, and the no fault insurance law in one state—Nevada—had expired the year before. Ten other states had some type of mandatory first-party automobile insurance coverage, but without any curtailment of tort recovery. *Id.*

Sess., *reprinted in* 1990 U.S.C.C.A.N. 3110, 3175; H.REP. No. 665, 101st Cong., 2d Sess., *reprinted in* 1990 U.S.C.C.A.N. 2931, 3019. Although the amendment created a cause of action against no fault automobile insurance carriers, § 1095 also required the United States to proceed under the FMCRA where recovery was still based on fault.[2] From this alone, it can be concluded Congress created a cause of action against automobile insurers only to the extent fault-based recovery was no longer feasible under the FMCRA.

The Court concludes the legislative history demonstrates § 1095, and in particular its reference to "no fault insurance," was not intended to apply to Medpay insurance. The United States contends this Court should consult only the legislative history of the amendment to § 1095 in order to determine Congressional intent. When the intended meaning of a statutory term is at issue, use of the same or similar terms in related legislation can be highly instructive. *See Brown v. Gardner,* — U.S. —, —, 115 S.Ct. 552, 555, 130 L.Ed.2d 462 (1994); *Fourchon, Inc. v. Louisiana Nat'l Leasing Corp.,* 723 F.2d 376, 382–83 (5th Cir.1984); *see also Flax v. Potts,* 204 F.Supp. 458, 466 (N.D.Tex. 1962) (statutes dealing with same subject matter and serving same general legislative purpose should be construed together), *aff'd,* 313 F.2d 284 (5th Cir.1963). Moreover, the United States has produced no contrary indications in the legislative history of the amendment to support the theory that Congress used the term "no fault insurance" to encompass all types of automobile insurance where there is "no" requirement of "fault."

Additionally, while there is no direct appellate authority to support the position of USAA, one can reason by reverse inference that the Seventh Circuit would confirm this Court's reading of the statute. As noted, in *United States v. United Servs. Auto. Ass'n,* 5 F.3d 204, 208 (7th Cir.1993), the Court determined the pre–1990 statute was only intended to reach issuers of health care insurance. In so deciding, the Seventh Circuit placed a narrow interpretation upon the word "insur-

ance." This Court's narrow interpretation of the amendment phrase "including an automobile liability insurance or no fault insurance carrier" is consistent with the Seventh Circuit's analysis of the plain language of § 1095, the legislative history of the section, and the backdrop of the statutory scheme in this area. *See id* at 206–09.

Finally, statutes that do not accurately codify congressional intent must be amended through legislative action rather than through statutory construction. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). By taking the position it has in this proceeding, the United States is asking the judicial branch to rewrite § 1095. There are, however, legislative processes to accomplish the result (the inclusion of first party coverage in § 1095) sought by the United States.

## WHETHER THE COURT MUST DEFER TO THE INTERPRETATION OF THE SECRETARY OF DEFENSE

█ The United States argues this Court must defer to the regulations promulgated by the Secretary of Defense, the authority charged with prescribing regulations for the administration of the statute. *See* 10 U.S.C. § 1095(f); 32 C.F.R. §§ 220.1–220.10 (1994). The Secretary construes the phrase "insurance, medical service, or health plan" to mean: "[a]ny plan or program ... that provides compensation or coverage for expenses incurred by a beneficiary for health or medical services and supplies." 32 C.F.R. § 220.12(f) (1994). The Secretary interprets the phrase "no fault insurance" as follows:

[n]o fault insurance means an insurance contract providing compensation for health and medical expenses relating to personal injury arising from the operation of a motor vehicle in which the compensation is not premised on who may have been responsible for causing such injury. No fault insurance includes personal injury protection and medical payments benefits

---

**2.** 10 U.S.C. § 1095(i)(2) (1995) provides: "[i]n cases of which a tort liability is created upon some third person, collection from a third-party

payer that is an automobile liability insurance carrier shall be governed by the provisions of Public Law 87–693 (42 U.S.C. 2651 et seq.)".

in cases involving personal injuries resulting from operation of a motor vehicle.

*Id.* at (i).

■ The United States asserts this Court must defer to these regulatory definitions. As with the judiciary, however, a federal agency is also not entitled to expand a statute beyond its intended scope under the guise of interpretation. *See Brown,* — U.S. at —, 115 S.Ct. at 556; *Office of Consumers' Counsel v. FERC,* 655 F.2d 1132, 1139–41 (D.C.Cir.1980). Nor is an agency permitted to adopt interpretive regulations which modify or conflict with "major policy decisions" already made by Congress. *See Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). For the reasons discussed above, this Court cannot defer to the DOD definitions because they conflict with the intent of Congress as revealed by the principles of statutory construction.

Moreover, the Secretary's interpretation is entitled to deference only if it is based on a reasonable construction of the statute. Otherwise, the DOD's position must be rejected. *See Chevron, U.S.A., Inc.,* 467 U.S. at 844, 104 S.Ct. at 2782. In reviewing the plain language of the statute, the legislative history of § 1095 and relevant statutes, policies, and reports, this Court has determined Congress' effort in amending § 1095 to include "no fault insurance" was limited to third-party automobile insurance mandated by statute and designed to replace tort liability. The United States has not presented controverting summary judgment evidence which would lead this Court to conclude it is reasonable to believe "no fault insurance" applies to all first-party automobile coverage. In the absence of this evidence, the Court cannot conclude the United States has met its burden to prove the Secretary's interpretation is reasonable. FED.R.CIV.P. 56.

### CONCLUSION

The Court holds that USAA is not a "third-party payer" under 10 U.S.C. § 1095 because its Medpay coverage is not "automobile liability insurance" or "no fault insurance." The Court further declines to give deference to DOD regulations, 32 C.F.R. § 220.12(f) and (i).

ACCORDINGLY, IT IS ORDERED that USAA's motion for summary judgment is GRANTED and the United States' motion for summary judgment is DENIED. Motions pending with the Court, if any, are denied. Each party is to bear its respective costs.

ORDERED, SIGNED and ENTERED.