DSC COMMUNICATIONS CORPORA-
TION, and DSC Technologies Cor-
poration, Plaintiffs,

v.

NEXT LEVEL COMMUNICATIONS,
Thomas R. Eames, and Peter W.
Keeler, Defendants.

No. 4:95cv96.

United States District Court,
E.D. Texas,
Sherman Division.

June 11, 1996.

---

Joseph D. Cheavens, Baker & Botts, Houston, TX, for plaintiffs.

Paul A. Renne, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, CA, for defendants.

## MEMORANDUM OPINION AND ORDER

PAUL N. BROWN, District Judge.

### Introduction

This is a theft of trade secrets case. Plaintiffs, DSC Communications Corporation and DSC Technologies Corporation (collectively "DSC"), filed suit against two of their former employees, Thomas Eames ("Eames") and Peter Keeler ("Keeler"), and the company they founded, Next Level Communications ("Next Level"). In July of 1990, Eames and Keeler began working for DSC. They entered into Employee, Patent, Copyright, and Proprietary Information Agreements (the "EPCPI Agreements") with DSC on April 22, 1990 and November 26, 1990, respectively. The EPCPI Agreements prohibited Eames and Keeler from disclosing proprietary information which they "may receive or develop during the course of [their] employment...."

Eames and Keeler formed Next Level and thereafter resigned from DSC on July 8, 1994. Next Level immediately began developing a product that would compete with DSC's product. On April 10, 1995, DSC filed this suit against Eames, Keeler, and Next Level in state court.[1] The action was removed from state court to this Court on April 17, 1995. A few months after the lawsuit was filed, General Instrument Corporation ("GI") acquired Next Level. As part of the acquisition, GI provided an indemnity to Eames and Keeler which indemnified them against all expenses, judgments, penalties, fines and amounts paid in settlement of this case to the fullest extent permitted by public policy.

DSC claimed at trial, that Eames and Keeler breached their fiduciary duties to DSC, breached their EPCPI contracts with DSC, and misappropriated DSC's trade secrets in the formation of Next Level, that Next Level knowingly accepted the benefits of Eames' and Keeler's wrongful conduct, and is using these secrets in the development of its competing product. Eames and Keeler responded that they took only their generalized professional knowledge and information that was available in the public domain when they left DSC. After DSC received a favorable verdict from the jury, Defendants filed a motion for new trial, which is now pending before the Court.

The subject of this Order is to resolve whether DSC properly introduced at trial evidence of the indemnification agreements between GI and Eames and Keeler.[2] As part of their Motion for New Trial, Defendants claim the Court erred in allowing testimony on the subject of the indemnity agreements. The other grounds for a new trial raised by Defendants will be resolved in a separate order.

As discussed below, the Court finds that the indemnification agreements are admissi-

---

1. Two other individual defendants were named in the suit but were ultimately dismissed by this Court based on a lack of personal jurisdiction over the defendants.

2. DSC also introduced evidence that NLC, Eames and Keeler failed to make certain warranties and representations to GI about the intellec-

tual property possessed by Next Level. The Court finds that the warranties, or lack thereof, are inextricably intertwined with the indemnity agreements. As such, the Court's discussion of the admissibility of the indemnification agreements also resolves the dispute over the warranty evidence.

ble for several reasons. First, the indemnity agreements are not liability insurance which is prohibited by Federal Rule of Evidence 411 and the agreements are admissible under Federal Rule of Evidence 403. Second, even if the indemnity agreements were liability insurance, they are admissible as evidence of DSC's damages or as evidence of Eames and Keeler's lack of ownership of the alleged trade secrets. Third, even if the indemnity agreements were liability insurance and not otherwise admissible for any proper purpose, Defendants' counsel opened the door to the admission of the evidence. Finally, even if the admission of the indemnity agreements was error, it was not error sufficient to warrant a new trial.

### Motion for New Trial Standards

■ Defendants' motion for new trial was timely filed. The Federal Rules of Civil Procedure allow a new trial to be:

> granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the Courts of the United States....

FED.R.CIV.P. 59(a). The Fifth Circuit gives trial courts a great deal of discretion in determining whether a new trial should be granted. *United States v. Lauga,* 726 F.2d 1032, 1035 (5th Cir.1984). This discretion is particularly applicable when a party complains, as Defendants complain here, that the evidence admitted is "so highly prejudicial and inflammatory that it is entitled to a new trial on all issues." *See Dixon v. International Harvester Co.,* 754 F.2d 573, 586 (5th Cir.1985) (In reviewing a district court's denial of a motion for new trial, the Fifth Circuit held that "[t]he district court did not abuse its sound discretion in admitting only these two photographs.").

### Discussion of Defendants' Motion for New Trial

### I. Federal Rule of Evidence 411

Federal Rule of Evidence 411 provides that:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

FED.R.EVID. 411. Rule 411 was adopted in 1972 to fulfill two purposes. First, the drafters believed that "the inference of fault from the fact of insurance coverage is a tenuous one, as is its converse." *Notes of Advisory Committee on 1972 Proposed Rules.* As Judge Weinstein explains:

> In the average automobile case the evidential hypothesis [prohibited by Rule 411] would be: "an insured person is more apt to be careless, reckless or do an intentional harm than an uninsured person because some one else will pay for any damages caused by his activity." The probative force of this line of proof is almost nil.... [The driver] knows that accidents result in higher premium rates for his future policies, so that there is an economic incentive not to be involved in accidents.

JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE ¶ 411[02] (1995) ("WEINSTEIN'S EVIDENCE").

The second policy underlying Rule 411 is the advisory committee believed "knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds." *Notes of Advisory Committee on 1972 Proposed Rules.* Specifically, the "improper grounds" referred to by the Advisory Committee is the belief that the jury might feel that "some rich insurance company will pay, so we might as well decide for this plaintiff without respect to the law and facts." WEINSTEIN'S EVIDENCE, ¶ 411[02] (1995).

### II. Rule 411 is Inapplicable in this Case since the Indemnity Agreements are not Liability Insurance

### A. Legal Characteristics of Liability Insurance

■ Rule 411 applies only to liability insurance. The indemnity agreements in

this case are not liability insurance.[3] While the phrase "liability insurance" is difficult to define, liability insurance does bear certain characteristics:

1) The insurer is paid to take the risk in question;

2) the insurer is well able to pay;

3) the insurer has agreed to indemnify the insured from liability to third persons as contrasted with coverage from losses sustained by the insured;

4) the insurer will spread the loss among its policy holders;

5) the insured will be disinclined to take an action which might cause the insurer to pay on a liability claim since the insured's premiums will rise; and

6) the insured is insuring a future risk.

*Larez v. Holcomb,* 16 F.3d 1513, 1524 (9th Cir.1994) (concurring in part and dissenting in part) (characteristics 1, 2, & 4); *Mazzaferro v. RLI Ins. Co.,* 50 F.3d 137, 139 (2nd Cir.1995) (characteristic 3) *McNeilab, Inc. v. North River Ins. Co.,* 645 F.Supp. 525, 538 (D.N.J.1986) (characteristic 3), *aff'd,* 831 F.2d 287 (3rd Cir.1987) (unpublished disposition); WEINSTEIN'S EVIDENCE ¶ 411[02] (1995) (implies that characteristic 5 is present since an insured "knows that accidents result in higher premium rates for his future policies, so that there is an economic motive not to be involved in accidents."); *Notes of Advisory Committee on 1972 Proposed Rules* (Characteristic 6 is implied by the Advisory Committee's finding that Rule 411 is needed since "the inference of fault from the fact of insurance coverage is a tenuous one, as is its converse."); *see also* FED.R.CIV.PROC. 26(a)(1)(D) (implying characteristics 1, 2 and 4 since initial disclosures are only mandated for indemnity or insurance agreements when "any person *carrying on a insurance business* may be liable to satisfy part or all of a judgment....") (emphasis added); WEBSTER'S THIRD NEW INT'L DICTIONARY p. 1173 (1986) (implying characteristics 1 and 4 by defining insurance as "a device for the elimination of or reduction of an *economic risk common to all members of a large group* and employing a system of equitable contributions out of which losses are paid") (emphasis added); *United Svcs. Auto. Ass'n v. Perry,* 886 F.Supp. 596, 601 (W.D.Tex.1995) (implying characteristic 4 by stating that liability insurance "has traditionally been defined as third-party coverage that indemnifies the insured from liability to others.").

## B. Application of the Legal Characteristics of Liability Insurance to the Indemnity Agreements

As the Court explained in its March 5th, 1996, Order:

> Under the economic realities of the transaction, GI has been "paid to assume risks." In other words, part of the consideration GI paid to Eames and Keeler during the NLC acquisition was to assume a potential liability.

Therefore, these indemnity agreements possess the first characteristic of liability insurance. The second characteristic of liability insurance is met since GI is able to pay the judgment in this case. Also, the third characteristic of indemnity insurance is met since

---

**3.** On March 5, 1996, this Court issued an Order which found that the indemnity agreement was "liability insurance" in light of *Larez v. Holcomb,* 16 F.3d 1513 (9th Cir.1994). However, a close reading of the case reveals that the *Larez* Court expressly refused to rely on Rule 411 when it held that a jury instruction in a § 1983 case which informed the jury that the municipal defendant would indemnify the individual police officer defendants was reversible error. *Id.* at 1520 n. 6 & 1521 n. 8.

To the extent that the Ninth Circuit excluded the indemnification evidence on general relevance and prejudice grounds, *i.e.* Rule 403, this Court agrees with the holding. However, this Court respectfully disagrees with the dicta which would exclude evidence of a municipal policy of indemnification under Rule 411 when the policy bears none of the characteristics of liability insurance. *See Delicious Foods Co. v. Millard Warehouse, Inc.,* 244 Neb. 449, 507 N.W.2d 631, 639 (Neb.1993) (state version of Rule 411 not applicable to property damage insurance); *Shamrock Homebuilders, Inc. v. Cherokee Ins. Co.,* 486 S.W.2d 548, 553 (Tenn.Ct.App.1972) (distinguishing between indemnity insurance and liability insurance). Finally, the Court notes that the *Larez* dicta discussing Rule 411 in the context of an indemnity agreement may conflict with a subsequent Ninth Circuit case where a unanimous panel upheld a district court's exclusion of evidence of indemnity under Rule 403. *Freeman v. City of Santa Ana,* 68 F.3d 1180 (9th Cir.1995).

GI has agreed to indemnify Eames and Keeler for liability to DSC. However, the indemnity agreements do not possess any of the remaining characteristics of liability insurance.

GI is unable to spread the risk among its "policy holders." Since GI is not in the business of insurance it has no "policy holders" other than Eames and Keeler. Furthermore, GI is unlikely to be able to spread its losses between Eames and Keeler. While it is theoretically possible that a judgment could be entered against one individual defendant and not the other individual defendant, the evidence introduced at trial establishes that, assuming that Eames and Keeler did misappropriate DSC's trade secrets, they acted in unison as joint tortfeasors. It is highly unlikely that the jury would have found that only one of the individual defendants committed a wrongful act.

Furthermore, these agreements were an isolated business arrangement between Eames and Keeler and GI. In all likelihood, Eames and Keeler will never enter into another indemnity agreement similar to the one in the instant case. Eames and Keeler no more worried about the effect that an adverse judgment might have on their next indemnity agreement than a person with life insurance worries about his death causing his future life insurance rates to rise.

Finally, and most importantly, Eames and Keeler were not insuring a future risk. As Judge Weinstein observes:

> Both insurers and insured are, in effect, encouraged to enter into contracts of insurance with the implied promise that they will not, *as a result of their forethought*, have what they believe to be the somewhat harmful inference of carelessness used against them.

WEINSTEIN'S EVIDENCE ¶ 411[02] (1995). (emphasis added). Eames and Keeler engaged in no forethought with GI. Rather, they negotiated the indemnity agreements *after they had already committed the acts that gave rise to this lawsuit.* DSC is not trying to use the tenuous inference of fault that might arise from the fact that the individual defendants obtained an indemnity policy and then engaged in conduct which might be covered by the policy. To the contrary, the fact that Eames and Keeler felt it necessary to "insure" against the contingency that they might be found to have stolen DSC's trade secrets is some evidence that they believed that they may not have owned the trade secrets. An individual's subjective belief that an act already taken is wrongful is probative, but not dispositive, as to whether the individual's conduct was wrongful. *Cf. California v. Hodari*, 499 U.S. 621, 624 n. 1, 111 S.Ct. 1547, 1548–1550 n. 1, 113 L.Ed.2d 690 (1991) ("See *Proverbs* 28:1 ('The wicked flee when no man pursueth.' ")).

In light of all of the above factors, the indemnity agreements between Eames and Keeler and GI are not "liability insurance." While the Eighth Circuit apparently has found that the Rule's language prohibiting evidence that a person was "insured against liability" prohibits the introduction of *any* type of risk allocation agreement, this Court respectfully declines to join the Eighth Circuit's broad reading of Rule 411. *Garnac Grain Co. v. Blackley*, 932 F.2d 1563 (8th Cir.1991); *Griffin v. Hilke*, 804 F.2d 1052, 1058 (8th Cir.1986) ("We see no distinction between [evidence that a government will indemnify its police officers in a § 1983 case] and the injection of testimony or argument concerning insurance, however."), *cert. denied*, 482 U.S. 914, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987).[4] In declining to follow

---

**4.** In *Garnac*, the plaintiff, Garnac Grain, brought suit against its accounting firm, Peat, Marwick, Main & Company ("Peat, Marwick") for accounting malpractice and breach of contract. *Garnac Grain Co. v. Blackley*, 932 F.2d 1563, 1565 (8th Cir.1991). Garnac Grain received a payment of two million dollars under a fidelity bond from its insurer before trial. *Id.* at 1570. The district court admitted evidence of the fidelity bond under Rule 411 to "demonstrate whether Garnac maintained adequate internal controls." *Id.*

The Eighth Circuit concluded that the district court abused its discretion in admitting evidence of the fidelity bond:

> While it may be true that the fidelity bond is not technically "insurance against liability," as Peat, Marwick argues, the bond is insurance. Consequently, if the jury learns of the fidelity bond, it might improperly reduce Garnac's damages should Garnac prevail. This is the kind of prejudice Rule 411 was intended to eliminate.

*Garnac,* this Court notes that *Garnac*'s holding that fidelity bonds are the equivalent of liability insurance may stand on weak jurisprudential legs. *Compare Garnac Grain Co. v. Blackley,* 932 F.2d 1563, 1570 (8th Cir. 1991) ("While it may be true that the fidelity bond is not technically 'insurance against liability,' ... the bond is insurance.") *with Anderson v. Employers Ins. of Wausau,* 826 F.2d 777, 780 (8th Cir.1987) (In a direct action case, the Court held that fidelity bonds are not "liability insurance."). Finally, the Court rejects the only other authority cited by the defendant, four unpublished district court cases ruling on motions in limine, as unpersuasive since they are either distinguishable on their facts or are wrongly decided.[5]

## C. The Indemnity Agreements are Admissible under the Rule 403 Balancing Test

■ The Court finds that the evidence's probative value on the issue of DSC's damages is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED.R.EVID. 403. In gauging the prejudice generated by evidence of the indemnity agreements, the Court finds the following guidance by the Third Circuit to be instructive:

It is doubtful that there would be any prejudice [by the introduction of the indemnity agreement] because the parties were both commercial entities, the injury was not likely to stir the emotions, and the existence of such coverage might have been so unusual that the purchase itself would have significance in the circumstances.[6]

*Posttape Assocs. v. Eastman Kodak Co.,* 537 F.2d 751, 758 (3rd Cir.1976).

## III. The Indemnity Agreements are Admissible for a Permissible Purpose Under Rule 411

■ Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted

---

*Id.* This Court submits that a finding that the fidelity bond is not "insurance against liability" ends any application of Rule 411. However, the Eighth Circuit's concerns about the danger of the jury improperly reducing Garnac's damages were valid and could have been addressed through the Rule 403 balancing test. In short, this Court does not disagree with the result of the *Garnac* case, but the Court does believe that the wrong analysis was applied to the evidence in light of Rule 411's clear application to only "insurance against liability." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 252–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

5. Defendants cite *Braun v. Lorillard,* WL N.D.Ill. 96–158W, 1996 U.S.Dist. LEXIS 205 (N.D.Ill. 1996); *Heflin v. City of Chicago,* 1996 WL 28238, 1996 U.S.Dist. LEXIS 672 (N.D.Ill.1996); *Curtis Mfg. Co. v. Plasti–Clip Corp.,* 1995 U.S.Dist. LEXIS 5416 (D.N.H.1995); and *Shea v. Fairman,* 1991 WL 160332, 1991 U.S.Dist. LEXIS 11494 (N.D.Ill.1991) along with the aforementioned *Larez* and *Griffin* cases as their sole authority for the fact that the evidence of the indemnity agreement is inadmissible. The unpublished cases carry little precedential weight for several reasons:

1) None of the four cases was designated for publication; *See, e.g.,* Elizabeth M. Horton, *Selective Publication and the Authority of Precedent in the United States Courts of Appeals,* 42 UCLA L.REV. 1691, 1695 (1995) ("Most circuits disfavor citation to unpublished opinions and many forbid citation outright in unrelated cases."); Martha J. Dragich, *Will the Federal Courts of Appeal Perish if They Publish....,* 44 AM U.L.REV 757, 802 n. 13 (1995) (surveying the various rules on the precedential value of unpublished opinions);
2) all of the cases are from district courts and none of them are under the control of the Fifth Circuit;
3) all of the cases are rulings on motions in limine which are not final rulings; *Curtis,* 1995 U.S.Dist. LEXIS at *11 ("At this *pre-trial stage,* none of the exceptions ... of Rule 411 appear to apply) (emphasis added); and
4) at least one of these cases was based upon an unopposed motion; *Heflin,* 1996 WL 28238 at 3, 1996 U.S.Dist. LEXIS at *8.

6. In this case, DSC has elicited a substantial amount of testimony that it is extremely unusual for a seller of intellectual property to obtain an indemnity from the buyer that essentially warrants the title of the seller's goods. Usually, the seller makes such a warranty to the buyer.

negligently or otherwise wrongfully. Subject to the provisions of Federal Rule of Evidence 403, such evidence is admissible for *any* relevant purpose other than the prohibited purpose of showing negligence or wrongful conduct. *Savoie v. Otto Candies, Inc.*, 692 F.2d 363, 369 (5th Cir.1982); WEINSTEIN'S EVIDENCE, ¶ 441[02] (1995) ("The rule lists the most common examples of uses of insurance falling outside the rule—proof of agency, ownership and control. But the matters mentioned are illustrative, not all inclusive...."); 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5365 (1980) ("[T]he trial judge has discretion to exclude the evidence [of insurance offered for a proper purpose] upon an appropriate balancing of the factors in Rule 403."). Defendants would be entitled to a limiting instruction on the admission of the indemnity agreements for a limited purpose; FED.R.EVID.P. 105 ("When evidence [is admissible for a limited purpose], the court, *upon request,* shall restrict the evidence to its proper scope and instruct the jury accordingly.") (emphasis added). However, Defendants did not request a limiting instruction and have waived their right, absent showing plain error, to complain about this Court's failure to give a limiting instruction. *United States v. Stevens*, 38 F.3d 167, 170 (5th Cir.1994) ("Defense counsel never requested a more complete limiting instruction ... and we cannot fault the district court for failing to give one spontaneously."); *see also U.S. v. Gaytan*, 74 F.3d 545, 555 (5th Cir.1996); *Staniewicz v. Beecham, Inc.*, 687 F.2d 526, 531 (1st Cir.1982); 21 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5065 (1977) ("[A party's] failure to request a limiting instruction does not waive his right to object to the admissibility of the evidence, though it does, of course, preclude him from

complaining on appeal that no instruction was given."). The Court finds no error, much less any plain error, in the admission of the indemnity agreements under Rule 411 without a limiting instruction.

## A. The Indemnity Agreements are Admissible on the Issue of DSC's Damages

■ DSC has contended both before and during trial that the entire acquisition of Next Level by GI is relevant to show the amount of damages suffered by DSC.[7] In fact, since neither party has yet to produce a product that is ready for sale to customers, the purchase price of Next Level, whose assets consist almost exclusively of the ideas that DSC claims were stolen, may be the least speculative method of deriving the value of the alleged trade secrets. *See generally* Stephen I. Willis, *An Economic Evaluation of Trade Secrets,* 269 PLI/Pat 737, at *35–40 (1989) (discussing the impact of the misappropriator's expected economic gain on the calculation of damages based upon the "reasonable royalty" theory).

Generally, when a plaintiff claims that insurance is relevant as to damages, Rule 411 will prohibit introduction of such evidence. As discussed earlier, the drafters of Rule 411 were afraid that a jury would be inclined to assess greater damages if they knew an insurance company with "deep pockets" would ultimately pay the judgment.

However, in the instant case, the legal basis for the introduction of the indemnity agreements is not to show which company will ultimately pay the judgment. Instead, the indemnity agreements are admissible since they were a part of the consideration paid by GI to Eames and Keeler for Next Level's stock. The assumption of the liability that might be imposed in a lawsuit has

---

7. As DSC's lead trial attorney argued in his opening statement:

After this lawsuit was filed, in April of 1995, General Instruments went ahead and acquired the balance of Next Level's stock from Mr. Eames and Mr. Keeler. * * * They paid ... about $91 million for this fifteen month old company.

... So the sum total that DSC seeks in this case is $359,312,000, a lot of money, but that

has to be put in context with the immense amount of money that General Instruments was willing to invest. $91 million, plus a lot of stock options in the future.... They're [Next Level's] a one product company. So what they hope to achieve by way of profits, *present value of profits that renders a value to the company is directly correlated with what [is] DSC's lost profits.*

*Trial Transcript,* pp. 108–111 (March 4, 1996).

some value to the Defendants. In this case, the value can be generally approximated[8] to a certainty equivalent by the following formula[9]:

$$(PC_d \times CD) + (PP_d \times PD) + LE = \text{value of the indemnity}$$

where $PC_d$ = Defendants' estimate of plaintiffs' percentage chance of a finding of liability for compensatory damages at trial;

$CD$ = Defendants' estimate of plaintiffs' compensatory damages;

$PP_d$ = Defendants' estimate of plaintiffs' percentage chance of a finding of the necessary predicate for punitive damages at trial;

$PD$ = Defendants' estimate of the punitive damages that would be awarded; and

$LE$ = anticipated litigation expenses which are covered by the indemnity.

This Court does not need to determine the exact value of the indemnity. Since the value of the indemnity is substantially greater than zero, the Court finds that the value of the indemnity is relevant to the issue of DSC's damages. As noted by Judge Pregerson:

> FRE 411 only prohibits the introduction of evidence of liability insurance *on the issue of whether the defendant acted negligently or otherwise wrongfully*. FRE 411 *does not* prohibit the use of evidence of insur-

ance where it is relevant to the issue of damages or punitive damages.

*Larez v. Holcomb*, 16 F.3d 1513, 1524 n. 3 (9th Cir.1994) (concurring in part and dissenting in part) (emphasis in original); *Pinkham v. Burgess*, 933 F.2d 1066, 1072 (1st Cir.1991); 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5364 (1980) ("Finally, Rule 411 does not prohibit the use of evidence of insurance where it is relevant to the issue of damages or punitive damages.... This was also the rule at common law."); Newell H. Blakely, *Article IV: Relevancy and Its Limits*, 30 HOUS.L.REV. 281, 487 n. 871 (Spring 1993) (asserting that insurance coverage is valid evidence of the defendant's "net worth" when resolving punitive damages); *see also Urico v. Parnell Oil Co.*, 552 F.Supp. 499, 502 & n. 2 (D.Mass.1982), *aff'd*, 708 F.2d 852 (1st Cir.1983); Leon Green; *Blindfolding the Jury*, 33 TEX.L.REV. 157, 162 (1954) ("On the issue of damages, the ability to pay is a highly significant fact, as it is in all affairs of life.").[10] As such, the evidence of the indemnity agreements was properly admitted for a proper purpose, showing DSC's damages, under Rule 411.

**B. The Indemnity Agreements are Admissible on the Issue of Ownership**

In addition to showing damages, the indemnity agreements are proper for another purpose. Rule 411 allows proof of insurance on the issue of "ownership." In the typical

---

**8.** The simplistic model that follows fails to take into account factors such as the degree of risk aversion of the defendants. Russell Korobkin & Chris Guthrie, *Psychological Barriers to Litigation Settlement: An Experimental Approach*, 93 MICH.L.REV. 107 (Oct.1994); Amy Farmer & Paul Pecornio, *Pretrial Negotiations with Asymmetric Information on Risk Preferences*, 14 INT'L REV.L. & ECON. 273 (Sept.1994); Note, *Settling for Less: Applying Law and Economics to Poor People*, 107 HARV L.REV. 442 (Dec.1993). However, the model is useful to approximate the value of the indemnity agreement.

**9.** Russell Korobkin & Chris Guthrie, *Psychological Barriers to Litigation Settlement: An Experimental Approach*, 93 MICH.L.REV. 107, 111 (Oct. 1994) ("[A] defendant will be willing to settle for an amount equal to the cost of an adverse trial judgment multiplied by a percentage chance of losing the case, plus trial costs, minus out-of-

court settlement costs.); The Honorable Richard A. Posner, *The Summary Jury Trial and Other Methods of Alternative Dispute Resolution: Some Cautionary Observations*, 53 U.Chi.L.Rev. 366, 369–70 & n. 8 (1986) (Judge Posner proposes a model similar to this Court's model to evaluate settlement).

**10.** While the Court draws support from Professor Green's law review article, it must part company with Professor Green to the extent that he believes that insurance should *always* be relevant on the issue of damages. Aside from considerations of the collateral source rule, the amount, as opposed to the "recoverability," of plaintiff's compensatory damages are rarely altered by the existence or nonexistence of defendant's insurance. In other words, the victim of a tort suffers neither more nor less damages because a wealthy or insured defendant is liable for his injuries instead of an indigent defendant.

case, when the defendant claims that it does not own the instrumentality that causes injury to the plaintiff, the courts have allowed the fact that the defendant has insured the property to show that the defendant actually did own the property. *E.g. Barnett v. Butler,* 112 So.2d 907, 909 (Fla.Ct.App.1959) ("If, as Butler insists, he was not the owner of the car but had sold it to Currington, it seems to us reasonable that he should have been obliged to explain, and the jury should consider, his reason for securing liability insurance...."). In this case, it is the alleged *lack of ownership* of the trade secrets that caused the Defendants to secure the indemnity agreements. As discussed above, the fact that Eames and Keeler felt it necessary to "insure" against the contingency that they might be found to have stolen DSC's trade secrets is evidence that they believed that they may not have owned the trade secrets. As such, this evidence is relevant to the issue of whether Eames or Keeler owned the alleged trade secrets.

### IV. Defendants' Counsel Waived Any Objection to Admission of the Indemnity Agreements

■ Even if evidence of the indemnity agreements was not admissible under Rule 403 or Rule 411, the defendant's counsel may waive any objection to the evidence of insurance [11] by "opening the door." *City of Villa Rica v. Couch,* 281 F.2d 284, 291 (5th Cir. 1960) (approving a trial court's ruling that a defendant "could not complain [about evidence of his insurance] because his own counsel had brought the matter out...."); *Garee v. McDonell,* 116 F.2d 78, 79–80 (7th Cir. 1940) (Defendant opened the door to evidence of his insurance when he made the "first mention of the matter of insurance in the presence of the jury, and his own counsel made no objection to it. He made two more references to the insurance company, and one more to 'the company' [before his counsel finally objected.]"), *cert. denied,* 313 U.S. 561,

61 S.Ct. 837, 85 L.Ed. 1521 (1941); *Royal v. Cameron,* 382 S.W.2d 335, 341 (Tex.Civ. App.—Tyler 1964, writ ref'd n.r.e.); *see* JOHN W. STRONG ET. AL, MCCORMICK ON EVIDENCE § 201 (4th ed. 1992) ("[F]ew courts will allow a defendant to show that he is uninsured, unless the plaintiff has opened the door to such evidence.").

Wright and Graham endorse the application of the doctrine of "opening the door," also known as curative admissibility, when the defendant engages in "poor-mouthing":

> [P]laintiffs have sometimes been allowed to show the existence of insurance in response to "poor-mouthing" by the defense. Writers with ties to New York have read Rule 411 as incorporating that state's rule barring the use of insurance evidence for this purpose. Writers from other venues have been more receptive to the application of the "curative admissibility" doctrine under Rule 411. Certainly, the latter view is more in accordance with notions of justice, though whether it was the intent of the drafters is an open question.

23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5368 (1980). Allowing curative admissibility in response to poor-mouthing has garnered support in both the judiciary and academia. *Bernier v. Board of County Rd. Comm'rs for Ionia County,* 581 F.Supp. 71, 78 (W.D.Mich.1983) ("[S]hould the nature of defendant's proofs be such that the jury might infer defendant's inability to pay a judgment, evidence that defendant has liability insurance may become admissible as an exception to the general prohibition of insurance evidence contained in Fed.R.Evid. 411."); *Younts v. Baldor Elec. Co.,* 310 Ark. 86, 832 S.W.2d 832, 834 (1992) ("When a party testifies about his or her financial condition in a false or misleading manner, however, he or she opens the door for the introduction of evidence which might otherwise be

---

11. There is no magical incantation which arises by uttering the word "insurance." *St. Pierre v. Houde,* 269 A.2d 538, 540 (Me.1970) ("[W]ords used by counsel which by clear implication suggest the presence or absence of insurance, even though the word itself may not be used, can be violative of the rule and constitute improper ar-

gument."); *Stehura v. Short,* 39 Ohio App.2d 68, 315 N.E.2d 492, 494 (Ohio Ct.App.1974) (refusing to "invite defense counsel to invent phrases which, without using the word 'insurance,' nevertheless effectively convey the impression that the defendant is uninsured.").

inadmissible under the collateral source rule."); *see also* 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5368 n. 40 (1980); JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 201 (4th ed. 1992) ("To be sure, in many cases [involving insurance] the relative wealth of the parties is manifest. A multinational corporation cannot disguise itself as a struggling member of the proletariat.").

As Judge Posner recently noted:

The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab. . . . It is bad enough that insurance or other indemnification reduces the financial incentive to avoid wrongdoing—which is why insuring against criminal liability is prohibited. It would be worse if the cost of insurance fell, reducing the financial disincentive to engage in wrongful behavior, because the insurance company knew that its insured could plead poverty to the jury.

*Kemezy v. Peters*, 79 F.3d 33, 37 (7th Cir. 1996) (dicta).

In this case, Defendants' counsel nudged the door open during voir dire [12] and continued pushing the door until the entire issue of the GI acquisition was exposed to the light of day. In addition to Defendants' counsel's assertion that this case was "a question of life and death" to Mr. Eames and Mr. Keeler, the Defendants pursued a "jilted suitor" theory throughout the case. The "jilted suitor" theory, as explained by Defendants' lead trial counsel, was that "part of the motivation for why they [DSC] instigated the litigation some 10, 12 months after [Mr. Eames & Mr. Keeler] had left was when they found out that they were not going to be, that their strategy of desiring to acquire this company was going to be unsuccessful [due to GI's acquisition of Next Level]." *Trial Transcript* p. 493 (March 6, 1996).

The Court initially precluded evidence of GI's acquisition of Next Level. However, both parties agreed during trial that evidence of the GI acquisition was opened up for the jury's consideration.[13] In fact, Defendants' counsel argued that the door had been opened wider than the Court originally ruled.[14]

Defendants originally offered all of the evidence about the acquisition of Next Level by GI *except for evidence about the indemnity agreements*. The jury was left with the erroneous impression that the consideration paid for Next Level was $91 million plus some stock options. As discussed above, the indemnity agreements are a key part of the consideration paid for Next Level. As such, Defendants should not be allowed to benefit from the misimpression planted in the jury's minds by Defendants' counsel that Next Level's value was only $91 million plus some

---

12. Specifically, defendants' lead trial counsel asked the venire if they would

> be perfectly satisfied to have some individual with my life experience, with my views, as my judge on this case which is worth a lot of money to DSC and *is a question of life and death to Mr. Eames and Mr. Keeler.*

*Trial Transcript* p. 56 (March 4, 1996) (emphasis added). Plaintiffs' lead trial counsel promptly objected outside of the presence of the jury:

> I believe that [the] statement on voir dire that this is life or death for Mr. Eames and Mr. Keeler has opened the door to a disclosure of the General Instrument indemnity, because indeed, if we are not permitted to do that, these jurors will think that the judgment we seek against Mr. Eames and Mr. Keeler is a personal judgment that they'll have to satisfy. . . .

*Id.* at 113.

13. *Trial Transcript* pp. 2057–60 (March 14, 1996). However, the Court's ruling was not based upon the agreement by the attorneys that the matter had been opened up. *Id.* at p. 2059. ("I think the jury needs the whole picture, and I'm going to let them have it."); *cf. Larez*, 16 F.3d at 1525 ("As Mark Twain said, 'when in doubt, tell the truth.'").

14. After the Court ruled that Defendants' counsel could elicit from Mr. Eames the reasons why he sought the indemnity agreement, but could not testify as to collateral matters, the following colloquy occurred:

> Defendants' Counsel: The box—the door has been opened, and if Your Honor's suggesting it's only open partway, I need to be—I need to know and the witness needs to know where we can go and where we can't. There's no guidance.
> The Court: The guidance, I think, is in the indemnity agreement, what he sought to indemnify, to be indemnified against. And if you will adhere to that, I don't believe you will have any trouble.

*Trial Transcript* pp. 3452–53 (March 22, 1996).

stock options. *See* 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5365 (1980) ("A situation ... occurs when the defendant introduces a part of a statement, omitting a portion mentioning insurance, and the plaintiff claims the right to have the rest put in under the 'completeness doctrine.' This was permitted at common law and the same result would follow under Rule 106."). Having opened the lid to Pandora's box, Defendants were displeased with the result. However, once the box containing the secret of the GI acquisition was opened, there remained no point in the Court closing the box. *Cf.* Deborah A. Smith & Rhonda K. Pitts, *Comparative Fault: A Primer*, 54 ALA.LAW. 56 (Jan. 1993) ("Pandora, who had been paralyzed with fear and horror, found strength to shut her box. The only thing left in it now, however, was the one good gift the gods had put in among so many evil ones, [t]his was hope.").

## V. Even if it was Error to Admit Evidence of the Indemnity Agreements, it was not Error Sufficient to Warrant a New Trial

■ As discussed above, this Court finds no error in the admission of the indemnity agreements into evidence. However, even if the Court erred in allowing the introduction of the indemnity agreements into evidence, it is not error sufficient to warrant a new trial.

Defendants claim that "[t]he law is well-settled that, absent some extraordinary circumstances, it is reversible error to permit the introduction of indemnity agreements...." *Next Level's Motion to Vacate the Jury Findings and Grant a New Trial* p. 7. As authority for their "well-settled" right to a new trial, the Defendants cite the same six cases discussed earlier in this opinion. *i.e.* the two published circuit court opinions which do not rely on Rule 411 and four unpublished district court opinions. However, a review of the authorities discussing Rule 411 and its common-law predecessor dispels any notion of a *per se* right to a new trial when the Defendants have not been prejudiced. *See, e.g., Balaklala Consol. Copper Co. v. Reardon*, 220 F. 584, 588 (9th Cir.1915) (In determining whether counsel's reference to an insurance company was unequivocally withdrawn from the jury, the Court noted that "there is no indication of prejudice in the amount of the verdict which was rendered."); *Devillier v. Penrod Drilling Co.*, 115 F.R.D. 32, 34 (E.D.Tex.1987) ("However, not every mention of the word 'insurance' or reference to the fact that the defendant carries insurance requires the granting of a motion for new trial."); *Vaughan v. Southern Bakeries Co.*, 247 F.Supp. 782 (D.S.C.1965); 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5369 (1980) ("In other words, reversal is required only when the injection of insurance has resulted in an excessive verdict."); *see also Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751, 758 (3rd Cir.1976) ("It is doubtful that there would be any prejudice [by the introduction of the indemnity agreement] because the parties were both commercial entities, the injury was not likely to stir the emotions, and the existence of such coverage might have been so unusual that the purchase itself would have significance in the circumstances."); *accord Kitsch v. Goode*, 48 Ill.App.3d 260, 6 Ill.Dec. 17, 362 N.E.2d 446, 451 (1977) ("Where a finding of liability has a complete basis in the evidence and the damage award is reasonable, the courts will conclude that the jury was not prejudiced by the remark."); *Kelty v. Best Cabs, Inc.*, 206 Kan. 654, 481 P.2d 980 (1971) (no reversible error found from the introduction of insurance when "modest" verdict did not reflect passion or prejudice); *Ruppert v. Yaeger*, 414 N.W.2d 419, 424 (Minn.Ct.App.1987) (finding no prejudice from an improper remark about insurance since the "damages awarded were, in the words of the trial court, 'surprisingly low' ... [and] there was ample evidence to support the verdict."); *Lilly v. Scott*, 598 P.2d 279, 284 (Okla.Ct.App.1979) (in addition to other reasons, the court held that "no prejudice can be said to be inflicted upon defendant because of the uncertainty of what kind of insurance was involved or who the insured was, coupled with the fact that defendant does not complain that the verdict is excessive which, after all, is the ultimate consequence of judicially assumed preju-

dice."); *Beall v. Ditmore,* 867 S.W.2d 791, 796 (Tex.App.—El Paso 1993, writ denied).

Therefore, a determination of whether the Defendants were prejudiced by the introduction of the indemnity agreements into evidence necessitates that this Court determine whether the verdict is excessive. In this case, the verdict was not excessive. DSC has elected to recover a total of $126,532,-000 [15] for compensatory damages resulting from Defendants' breach of fiduciary duty. This amount is well below the amount requested by DSC ($277,000,000), but well above the damages that Defendants contend existed ($0). Such a damage amount is squarely within the acceptable range of damages available to the jury and is not excessive.

The jury's award of punitive damages also reveals that Eames and Keeler were not unfairly prejudiced by the introduction of the indemnity evidence. The jury awarded $100,000 in punitive damages against each of Eames and Keeler who were potentially covered by the indemnity agreements, but awarded $10,000,000 against Next Level, a defendant who was not covered by the indemnity agreements. The relatively small [16] amount of punitive damages in proportion to actual damages dispels any notion that the jury awarded larger damages to the DSC due to the fact that Eames and Keeler were indemnified.

Defendants also claim that they were prejudiced by the late admission of the indemnity evidence into trial. The Court initially granted Defendants' Motion in Limine excluding evidence of the indemnity agreements. However, on the next to last day of trial the Court, in light of the evidence produced at trial, informed the parties that it was considering granting DSC's motion for reconsideration of the earlier ruling on indemnity. On the morning of the last day of trial, the Court informed the parties that it would allow the parties to introduce the indemnity agreements into evidence. At that time, Defendants claimed that they had only approximately three and one half hours of allotted trial time remaining. As such, in light of the "new" evidence that the parties wanted to place before the jury, the Court *sua sponte* granted each side an additional half hour of trial time.

Defendants' arguments that they were unfairly prejudiced by the introduction of the indemnity evidence on the last day of trial fail for several reasons. First, Defendants did not use all of their allotted trial time, nor did they request additional time.[17] Second, Defendants have failed to show why the introduction of the indemnity agreements on the last day of trial would be any more prejudicial than if the evidence had been presented on the first day of trial. Finally, Defendants did not ask for an instruction from the Court which would have been able to alleviate their concern that it "appeared that Next Level hid the evidence from the jury...." *Next Level's Motion to Vacate the Jury Findings and Grant a New Trial* p. 13.

---

15. The jury's verdict on this issue totalled $144,-000,000. However, the Court reduced a subset of the damages (*i.e.* the Litespan lost income) to correspond with the evidence introduced in the case.

16. The Court is well aware that $200,000 is not a small number in absolute terms. *Wyoming v. Oklahoma,* 502 U.S. 437, 453 n. 11, 112 S.Ct. 789, 799–800, n. 11, 117 L.Ed.2d 1 (1992) (Senator Everett Dirkson's famous observation can be aptly paraphrased as "a half million dollars here and a half million dollars there, and pretty soon real money is involved."). However, in relative terms as weighed against both the large verdict and the large punitive damages amount awarded against Next Level, it is not a figure which appears to be grounded in prejudice, bias, or inflamed emotions of the jury. In fact, the punitive damages against Eames and Keeler in this case

comprise less than 0.2% of the total recovery by the plaintiff ($200,000 divided by $136,732,000).

17. Defendants claim that they ended the trial with six minutes of trial time. The records maintained by the Court's Courtroom Deputy reflect that Defendants had substantially more trial time remaining. However, for the purposes of analysis, the Court accepts Defendants' claim as true. The Court finds that the failure to use the time allotted should be a *per se* bar against complaints that the Court did not give the parties enough trial time. This theory is analogous to the general refusal of courts to find harm in a trial court's erroneous denial of a "for cause" strike when the party has not exhausted its preemptory strikes. *U.S. v. Williams,* 822 F.2d 512, 514 n. 1 (5th Cir.1987); *U.S. v. Hardy,* 941 F.2d 893, 897 (9th Cir.1991).

Defendants also complain that the Court erred in admitting redacted copies of the indemnification agreements. However, the redacted portions were in the preamble and contained a reference to settlement negotiations that transpired in this case. As such, the redacted portions were properly excluded from the jury. FED.R.EVID. 403 & 408.

### Conclusion

For the above mentioned reasons, Defendants' Motion for New Trial should be denied as to the issue of the admission of the indemnification agreements. All other grounds raised by the Defendants will be resolved in a subsequent Order.

IT IS SO ORDERED.